## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND-ODESSA DIVISION

| | |
|---|---|
| **ADAPTIVE AVENUE ASSOCIATES, INC.,** | C.A. NO. |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| **WALMART INC.,** | **PATENT CASE** |
| Defendant. | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Adaptive Avenue Associates, Inc. ("Adaptive Avenue" or "Plaintiff") files this Original Complaint for Patent Infringement against Walmart Inc. ("Walmart" or "Defendant") and alleges as follows upon actual knowledge with respect to itself and its own acts and upon information and belief as to all other matters:

### I.        THE PARTIES

1.        Plaintiff Adaptive Avenue is a Minnesota corporation, having a principal place of business located at 445 Minnesota St. #1500, St. Paul, MN 55101.

2.        Upon information and belief, Defendant is a Delaware corporation with its principal place of business at 702 S.W. 8th Street #555, Bentonville, Arkansas 72716. Defendant may be served through its registered agent in Texas, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

3.        On information and belief, the Defendant regularly conducts and transacts business in the State of Texas, throughout the United States, and within this District, and as set forth below, has committed and continues to commit, acts of infringement within and outside the State of Texas and within this District.

## II.    JURISDICTION AND VENUE

4.    This action is a civil action for patent infringement arising under the patent laws of the United States, Title 35, United States Code ("U.S.C.") § 1 et seq., including 35 U.S.C. §§ 271 and 281-285. This Court has exclusive subject matter jurisdiction over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338.

5.    This Court has personal jurisdiction over the Defendant by virtue of their systematic and continuous contacts with this jurisdiction, as alleged herein, and because the injury to Adaptive Avenue occurred in the State of Texas and the claim for relief possessed by Adaptive Avenue against the Defendant for that injury arose in the State of Texas. On information and belief, the Defendant has purposely availed itself of the privileges of conducting business within the State of Texas, such business including but not limited to at least a portion of the infringements alleged herein. Thus, the Defendants are subject to this Court's specific and general personal jurisdiction under due process and the Texas Long Arm Statute.

6.    Without limitation, on information and belief, within this state, the Defendant has used the patented inventions thereby committing, and continuing to commit, acts of patent infringement alleged herein. In addition, on information and belief, Defendant has derived revenues from their infringing acts occurring within Texas. Further, on information and belief, the Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from services provided to persons or entities in Texas. Further, on information and belief, the Defendant is subject to the Court's personal jurisdiction at least due to the Defendant providing services within Texas. Moreover, Walmart owns and operates www.walmart.com, through which it uses the infringing systems and methods to offer products to users in this District.

7.     The Defendant has committed such purposeful acts and/or transactions in Texas such that the Defendant reasonably should know and expect that it could be haled into this Court as a consequence of such activity.

8.     Adaptive Avenue's claim for relief for patent infringement arises directly from the activities of the Defendant in this District. On information and belief, the Defendant, directly and/or through their customers have transacted business in this District and have committed acts of patent infringement in this District. Moreover, Walmart owns and operates www.walmart.com, through which it uses the infringing systems and methods to offer products to users in this District. The Defendant maintains a distribution facility at 3900 N IH 35, New Braunfels, TX 78130 that employs over 700 people and receives and ships about 1.38 million cases of merchandise annually. Defendant also maintains retail locations throughout the state of Texas, including a Walmart Superstore at 4320 Franklin Ave, Waco, TX 76710. The Defendant has committed acts within this District giving rise to this action and continues to conduct business in this District, including one or more acts of using, importing, selling and/or offering for sale products through the use of infringing systems and/or methods in this District. Thus, the Defendant has a regular and established place of business in this District and venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b).

### III.  FACTUAL ALLEGATIONS

9.     On January 30, 2007, United States Patent No. 7,171,629 ("the '629 Patent") was duly and legally issued by the United States Patent and Trademark Office. The '629 Patent is titled "Customizable Web Site Access System And Method Therefore."  The term of the '629 Patent has been adjusted by 252 days. A true and correct copy of the '629 Patent is attached hereto as Exhibit 1 and incorporated herein by reference.

- 3 -

10. An exemplary embodiment of the code to implement the invention claimed in the '629 Patent was submitted on a compact disc with the application leading to the '629 Patent. A directory print-out of the exemplary embodiment is included in columns 1-7 of the '629 Patent.

11. Adaptive Avenue is the assignee of all right, title, and interest in the '629 Patent, including all rights to enforce and prosecute actions for infringement and to collect damages, including past damages, for all relevant times against infringers of the '629 Patent. Accordingly, Adaptive Avenue possesses the exclusive right and standing to prosecute the present action for infringement of the '629 Patent by Defendant.

12. The '629 Patent describes a system and method to create and display a presentation on a website. Ex 1 at 7:30-35; 8:5-14. In one embodiment, the '629 Patent describes a "software program" to create and display a presentation. *Id*. at 8:5-7. In that embodiment, the software program is used to create a "presentation [that] includes a list of URLs for display, a desired sequence of display of the URLs, and a duration of display of the URLs." *Id*. at 8:7-10. The software program displays the presentation "to a user of the web according to the URL list, sequence of display, and duration of display." *Id*. at 8:10-14.

13. As stated in the '629 Patent, the inventor recognized inefficiencies of the prior art's ability to deliver automated presentations without needing to reprogram the web site and enable targeted content for the specific user. *Id*. at 7:60-67. The '629 Patent states that "there is a need for a web site access system that enables web site owners and developers to provide an automated presentation of desired web page sequences without the costs of reprogramming site content or installing development tools, and that enables we site users to adjust those presentations to their preferences . . . ." *Id*. at 7:60-65.

14.    On September 23, 2008, United States Patent No. 7,428,707 ("the '707 Patent") was duly and legally issued by the United States Patent and Trademark Office. The '707 Patent is titled "Customizable Web Site Access System And Method Therefore." A true and correct copy of the '707 Patent is attached hereto as Exhibit 2 and incorporated herein by reference.

15.    The application leading to the '707 Patent was filed October 31, 2003, which was a continuation-in-part of application no. 10/014,929, which issued as the '629 Patent. (Ex. 2 at cover).

16.    Adaptive Avenue is the assignee of all right, title and interest in the '707 Patent, including all rights to enforce and prosecute actions for infringement and to collect damages, including past damages, for all relevant times against infringers of the '707 Patent. Accordingly, Adaptive Avenue possesses the exclusive right and standing to prosecute the present action for infringement of the '707 Patent by Defendant.

17.    The invention in the '707 Patent relates to the manner in which a user and/or developer of the World Wide Web presents and/or accesses a web site; and more specifically, to a system and method to enable multiple types of automated navigation through a plurality of website addresses.  *Id*. at 1:24-28.

18.    Mr. Quimby is the sole inventor on the '629 Patent and the '707 Patent. Ex. 1 at cover; Ex. 2 at cover. Mr. Quimby is also the founder, major shareholder, and CEO of Adaptive Avenue.

## **Background of the Invention**

19.    Prior to conceiving the inventions disclosed in the '629 Patent, Mr. Quimby received a Bachelor of Arts degree in Economics with an emphasis in mathematical economics and developmental economics from the University of California, Los Angeles in 1980.  He went

on to receive a Master of Business Administration with emphasis in organizational behavior and sociotechnical systems from the University of California, Berkeley in 1987.

20.    From 1981 to 1983, Mr. Quimby worked as a senior systems analyst in the electronic banking division at Bank of America, conducting analysis of business processes and conducting the planning, design, and implementation of financial analysis and planning systems in large-scale applications.

21.    Between 1983-1985, Mr. Quimby worked as a senior consultant in the advisory services group at Deloitte & Touche, primarily conducting technical and economic feasibility analysis of large-scale system development initiatives for the U.S. Air Force.

22.    From 1988 to 1990, after finishing his graduate studies, Mr. Quimby worked as a senior technology analyst at Stanford Research Institute ("SRI"). While there, he advised an array of manufacturing and service industries on emerging opportunities in artificial intelligence and assisted in the conception and launch of interdisciplinary, multi-client initiatives in distributed computing, hyper-distributed computing, and social computing. Mr. Quimby collaborated with Doug Engelbart, a pioneer in interactive computing and a principal inventor of the graphical user interface ("GUI") and other foundational elements of interactive computing in his Augmentation Research Center ("ARC") at SRI.

23.    From 1991 to 1996, Mr. Quimby returned to Bank of America as a technology planner and technology executive in the world banking division, eventually earning the corporate title of vice president. While there, he led the adoption of client-server architecture and an object-oriented development environment in an asset distribution group. He managed the phased implementation of a geographically distributed operating platform.

24.     In the mid to late 1990's, Mr. Quimby's interests turned to the emerging phenomenon of the World Wide Web and he began the entrepreneurial pursuit of problems with the usability and navigation of the World Wide Web. The World Wide Web of the mid 1990's was vastly different than it is today.

25.     After Tim Berners-Lee created software in 1989 that could present HTML documents in an easy to view manner that he called the WorldWideWeb, in 1993, Marc Andreessen, working with Berners-Lee, launched Mosaic, the first true Web browser. Mosaic allowed for an explosion of internet activity from 1993-1996. In 1994, Andreessen and Jim Clark formed Netscape Communications and developed Netscape Navigator, a new Web browser that was faster and more sophisticated than Mosaic or any other browser of the time. Browsers like Netscape Navigator were the leaders in what has since been referred to as Web 1.0, which reigned until roughly 2004. Web 1.0 was characterized by static Web pages retrieved from servers, which was an approach and user experience that is dramatically different from the experience we take for granted today.

26.     Mr. Quimby recognized the limitations of Web 1.0 browsers and believed he could provide a technological solution to the internet-specific problem of usability and navigation on the Web. Accordingly, he left Bank of America in 1996 to begin the entrepreneurial pursuit of providing a solution to problems associated with internet usability. Specifically, it became clear to him that the conventional way of viewing information on the Web was limited. Web users had to expend too much attention and effort to navigate through a sequence of multiple static Web pages or view search results by clicking through each result individually. He envisioned a technological solution that enabled Web developers and/or Website hosts to provide an automated presentation of information in organized sequences without the cost and complexity of

reprogramming site content. He also recognized the need for Web users to view presentations created by Web developers or create their own presentations of Web content without installing development tools on their computers.

27. In 1998, Mr. Quimby founded Virtual Coast Associates, Inc., as a platform for incubating various Web-related opportunities. In 2000, he founded Adaptive Avenue to commercialize the technology that forms the basis of the invention disclosed in the '629 Patent and '707 Patent.

28. Prior to Mr. Quimby's conception and reduction topractice of the claimed inventions in the late 1990's to 2001, the existing technology for viewing content on the World Wide Web was either monolithic (not modular and customized to the user's particular situation) or tedious and labor-intensive. Likewise, although the existing technology at the time allowed for continuous presentation of information on the Web (e.g., Flash animation), it did not allow automated presentation of Web page content and it did not allow continuous presentation without the cost of reprogramming site content or installing development tools. *See* Ex. 1 at 7:62-64.

29. The dominant solution for dynamic, and/or animated, presentation on the Web during the late 1990's to early 2000's was Flash animation (and its predecessors). The rise of Flash began circa 1995 with the acquisition of FutureSplash by Macromedia, which renamed it to Macromedia Flash. Flash provided a rich, interactive experience that was new to the Web and significantly improved on the user experience that was available using static HTML. In order for Web users to gain the benefits of Flash, they needed to obtain and install a Flash plugin to view Flash content on their computers. Moreover, Flash content was not inherently modular. Updating or modifying a portion of a Flash experience required recompiling the whole experience, even for small changes.

30.     As a result of its dynamic capabilities, Flash eventually became synonymous with cutting-edge Web design, becoming a fundamental tool in the toolbox for Web designers.  Use of Flash grew rapidly during 2000 to about 2010.  By 2010, approximately 30% of Web sites were using Flash.  Further, Flash dominated the client-side market, with the Flash player residing on about 95% of internet-connected desktop computers in 2010.

31.     Around 2010, as more robust Web technologies such as HTML5, CSS3, and JavaScript began to replicate much of the Flash functionality without requiring a plugin, the popularity of Flash began to decline.  By 2015, all major Web browsers supported these newer standard technologies that were more robust than Flash, which ran natively in the browser and were both more secure and efficient than Flash.  Use of Flash on Web sites had dropped to approximately 15%.  Web browsers gradually announced timelines to drop Flash support, with Adobe retiring Flash in 2020.  HTML5 and JavaScript displaced Flash on the desktop because they enabled flexible, modular systems that matched how the technological solutions for the Web evolved.  These solutions also did not suffer from the perpetual security problems afflicting Flash.

32.     As a result of Mr. Quimby's background, interest, experience, and knowledge, he was uniquely positioned to provide a technological solution to the problem of Web usability that overcame the limitations of both Web 1.0 and Flash.  Specifically, Mr. Quimby was focused on providing a technological solution that would enable developers to create Web slide show presentations of information in organized sequences without the cost and complexity of reprogramming site content.  His solution also enabled Web users to view presentations created by Web developers or create their own presentations of Web content without installing development tools on their computers.

**The Invention in the `629 Patent and its Inventive Concepts and Advantages**

33.    As explained above, when Mr. Quimby conceived his inventions, the World Wide Web was adapted to flexibly serve individual Web pages, but it was not adapted to serve sequences of Web content. The specification of the '629 Patent notes the need for his inventions, in part, as follows:

> [T]here is a need for a web site access system that enables web site owners and developers to provide an automated presentation of desired web page sequences without the costs of reprogramming site content or installing development tools, and that enables web site users to adjust those presentations to their preferences and/or enact their own presentation of web sites of interest, such as through the use of search engine results.

(Ex. 1 at 7:60-67). Mr. Quimby's inventions addressed this problem and need, by enabling developers to create Web slide show presentations of information in organized sequences without the cost of reprogramming site content and enabling Web users to view presentations created by Web developers or create their own presentations of Web content without installing development tools.

34.    In conceiving and reducing his inventions to practice, Mr. Quimby overcame technological problems necessarily rooted in computer technology with the ability to use server-side technology, without installing client-side technology, to create a slide show presentation on the World Wide Web.  For example, although the World Wide Web, in its preexisting client-server architecture, was adapted to flexibly serve individual Web pages, it was not adapted to serve sequences of Web content. Likewise, the problems he addressed were not overcome by implementing existing methods of a slide show, photo slide show, or computer slide show presentation on the Web or by conventionally selecting various information sources to display. Mr. Quimby authored a feature article in the July 2003 edition of XML Journal (Vol. 4 Issue 7)

describing the emerging landscape of the Internet that required a solution like the invention claimed in the '629 Patent.

35.    Mr. Quimby's invention improved existing web technology by helping retain web users' attention and creating a flexible and seamless user experience over client-server architecture.  The '629 Patent notes the improvement in Web user and visitor experience as follows:

> [I]t can be seen that besides guiding visitors more quickly to relevant content, the present invention virtually eliminates the attention that visitors normally invest in pointing, clicking, and scrolling through web pages. As such, visitor satisfaction and productivity is increased, i.e., visitors to a web site stay longer, absorb more information, and return more quickly. The model of a passive site and active visitor clicking through pages is replaced by the adaptive presentation model of active site and active visitor. In this active site/active visitor model the site owner or developer can offer a range of tours through a site wherein each tour is adapted to the interests of a wide range of target audiences. Meanwhile, the visitor can have single-click control for pausing at any page to delve more deeply into available content and can also control the pace of presentation as well as select another presentation. Instead of actively pursuing random paths through web sites one click at a time, visitors now have a choice. They can relax and enjoy one or many pre-established presentations—all with the option of stopping and/or diverting anytime they encounter interesting content.

Ex. 1 at 13:30-50.

36.    Mr. Quimby's invention provided a solution that included Web-development flexibility and seamless user experience over client-server architecture. He conceived a system and method that used components, such as a composer and a performer, to gather URLs and create a continuous presentation of Web content and conceived a system and method that would address the problems rooted in the existing approach to continuous delivery of Web content.  His invention embraced at least three inventive concepts at a high level: 1) rotation of Web pages in organized sequences; 2) sequences of Web pages that can be organized 'on the fly' – dynamically, at run

time; and 3) use of a Web-service architecture to deliver this experience seamlessly without client-side implementation.

37.    The three inventive concepts are found in the claims of the '629 Patent.  For example in claim 11 of the '629 Patent, the rotation of Web pages in organized sequences is implemented in the combined limitations "establishing a list of URLs in said composer by one of a plurality of list establishment methodologies," "determining a display sequence of said list of URLs in said composer," and "automatically locally displaying the created presentation presented by said performer in a slide show format according to said list and said display sequence, wherein each of said plurality of URLs comprises a slide within said created presentation." Also in claim 11, the sequences of Web pages that can be organized "on the fly" – dynamically, at run time is implemented in the limitation "establishing a list of URLs in said composer by one of a plurality of list establishment methodologies the plurality of list establishment methodologies comprising manual entry via a user interface portion of the composer and automatic entry by a query-based system."  Also in claim 11, the use of a Web-service architecture to deliver this experience seamlessly without client-side implementation is implemented in the limitation "remotely invoking a composer operating on a host server," limitations discussing the operation of the composer that is operating on the host server (e.g., "creating a presentation in said composer, wherein said step of creating comprises the steps of: establishing a list of URLs in said composer"; "determining a display sequence of said list of URLs in said composer"; "determining a duration of display for said list of URLs in said composer"), and the limitation "remotely invoking a performer operating on said host server to present said created presentation."

38.    In providing a more seamless way of navigating through the World Wide Web, Mr. Quimby's inventions disclosed in the '629 Patent address a particular challenge to the World Wide

Web of retaining website visitors while conveniently and efficiently providing web content to users. The invention created a fundamentally different Web presentation experience without re-architecting the underlying Web technology.

39.    In addition to the problems addressed by Mr. Quimby's invention, Mr. Quimby encountered several problems in perfecting the invention and reducing it to practice. For example, initial prototypes ran on a host server and employed a client-side component using a scripting language that required installation. This approach was not scalable, and he eventually solved the problem by employing a client-side component using a scripting language that ran natively in the Web browser, including an embodiment using JavaScript.

40.    The commercial embodiment of the invention was endorsed by Doug Engelbart.

**The Invention in the `707 Patent and its Inventive Concepts and Advantages**

41.    Plaintiff incorporates the above paragraphs herein by reference.

42.    As a continuation-in-part of the '629 Patent, the '707 Patent includes all of the disclosure of the '629.

43.    In many respects, the '707 Patent is concerned with solving the same technological problems with the Web as the '629 Patent. Specifically, claim 7 of the '707 Patent relates to the way a user and/or developer of the World Wide Web presents and/or accesses a web site. More specifically, claim 7 of the '707 Patent recites a method to enable multiple types of automated navigation through a plurality of website addresses. Of particular advantage to the invention claimed in the '707 Patent is the unconventional feature for auto-composing a website with automatic extraction of web page details from a desired web page. In the prior art, a slideshow was composed manually and then stored in a file using standard HTML format with a specific name at a specific location. The technological improvement claimed in the '707 Patent includes composing

- 13 -

a presentation for a desired web page by creating a list of URLS by auto extracting a plurality of hyperlinks found within the desired web page that provides a plurality of URLs and then automatically displaying the presentation in order of the plurality of URLs provided by the extracted web page details.

44.     Additionally, as shown in the prosecution history of the '707 Patent, the Patent Examiner determined that it was unconventional to automatically compose a slideshow through the automatic extraction of web page details.  The Patent Examiner determined that in the prior art, the slideshow was composed manually and then stored in a file using standard HTML format with a specific name at a specific location. The Examiner agreed that the claims were allowable because the prior art did not disclose a plurality of hyperlinks found within the desired web page that provides a plurality of URLs, a presentation/rendition text file within the desired webpage that provides a plurality of URLs, a meta tag within the desired webpage that provides a plurality of URLs; and a performer wherein said performer displays said web slide show presentation in order of the plurality of URLs provided by the extracted web page details.

### Market Benefit to Infringing Methods and Systems

45.     After the collapse of Flash, as infringing uses of the claimed inventions skyrocketed beginning around 2015, the market recognized and realized the enormous benefit of the claimed inventions, which remain an industry standard to this day. The inventions claimed in the '629 and '707 Patents have come to be referred to as carousel ads, which means ads that automatically rotate through a series of Web pages. After nearly a decade of use, publishers and analysts have found that the infringing carousel ads can drive up to ten times higher click-through rates as compared to static ads, which are favored by 90% of users over static ads. It has further been determined that

infringing carousel ads may generate leads at a cost-per-conversion of 30 to 50% lower than other ad formats and at a 20-30% lower cost per click than single-image link ads.

## IV.    COUNT I
## (PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 7,171,629)

46.    Adaptive Avenue incorporates by reference the above paragraphs as if stated herein.

47.    Walmart has directly infringed the '629 Patent, including but not limited to at least claim 11 of the '629 Patent, by making, using, offer for sale, and or selling products using the infringing method for customizing access to a plurality of websites using www.walmart.com (the "Accused Instrumentalities")  all to the harm and detriment of Adaptive Avenue, and to the benefit of Walmart.

48.    The screenshots, images, and videos referenced here are derived from the Internet Archive of the Walmart web site on 4/18/2019 at the following location: https://web.archive.org/web/20190418113954/https://www.walmart.com/.

49.    Upon information and belief, the Accused Instrumentalities function in substantially the same manner from April 18, 2019, through the entirety of the infringement period.

50.    The Defendant and/or other actors under the Defendant's direction or control perform methods for customizing access to a plurality of web sites in connection with www.walmart.com.  The carousel ads presented on www.walmart.com show customized access to a plurality of web sites.

51.    The Defendant, and/or others under its direction or control, perform the step of remotely invoking a composer operating on a host server.  The composer can be invoked remotely using a Web browser and/or its associated code or functions.  Alternatively, the composer invoker

- 15 -

includes the code or component that detects a Web user's entry into the web site www.walmart.com, and subsequently invokes a composer that accepts the list of URLs of the Web slide show presentation.

52.     Further, the composer operates on a host server comprised of the Web server or network of servers of the Accused Instrumentality.  Host-side resources are used each time the composer is used to establish a list of URLs.  The code below shows the list of URLs:  first, for the "Free Store Pickup.  Last-Minute scramble?  Get egg-cited! Order Easter must-haves & pick up as soon as today." panel; second, for the "Apple Watch Series 3.  Stay active. Stay healthy. Stay Connected.  Starting at $199." panel; and third, for the "Hurry! Ends 4/19.  Save up to 35%. Final days to get low, low prices on everything for your backyard.  Shop all." panel:







53.     The Defendant, and/or others under its direction or control, creates a presentation in said composer.   The presentation with the three panels shown above was created by the Defendant in a composer.

54.     The Defendant, and/or others under its direction or control, performs the step of establishing a list of URLs in the composer by one of a plurality of list establishment methodologies, including manual entry via a user interface portion of the composer and automatic entry by a query-based system.  As shown by the source code in Paragraph 52 above that includes URLs, the composer creates the list either manually or automatically.

55.     The Defendant, and/or others under its direction or control, performs the step of determining a display sequence of the list of URLs in the composer.  As shown by the sequence of panels and the corresponding source code in Paragraph 52, the Defendant has determined a display sequence for the list of URLs that correspond to the three panels shown in Paragraph 52 in the following order:

https://web.archive.org/web/20190418113954im_/https://i5.walmartimages.com/dfw/4ff9c6c9-1824/k2-_388906b8-2ee1-4c5c-a82e-3a5c14646f11.v1.jpg



https://web.archive.org/web/20190418113954im_/https://i5.wal.co/dfw/4ff9c6c9-2f49/k2-_aa22da14-fcec-487d-a735-71663801a0c4.v1.jpg-a3d3705978f9df5902dcdbdcc7fd4de5475c4f6e-optim-1360x410.jpg



https://web.archive.org/web/20190418113954im_///i5.walmartimages.com/dfw/4ff9c6c9-3151/k2-_ec736d3d-f76e-46ed-af0d-acbac421af45.v1.jpg



56.     The Defendant, and/or others under its direction or control, performs the step of determining a duration of display for the list of URLs in the composer.  Exhibit A shows a video of the walmart.com website rotating through different URLs, where each slide is displayed for a determined duration before the next is displayed.  As such, the Defendant determines the duration of display for the list of URLs in the composer.

57.     The Defendant and/or other actors under Defendant's direction or control performs the step of remotely invoking a performer operating on the host server to present the created presentation.

58.     The step of remotely invoking the performer occurs any time a Web user navigates to www.walmart.com thereby invoking performance of the Web slide show.  The Defendant owns and controls the walmart.com website.

59.     The Defendant and/or other actors under the Defendant's direction or control performs the step of automatically locally displaying the created presentation presented by the performer in a slide show format according to said list and said display sequence.  As shown in Exhibit A, when a user is on the walmart.com website on or about April 18, 2019, the presentation provided above is automatically locally displayed by the performer in a slide show format according to the URL list and the display sequence.

60.     Each of the plurality of URLs comprises a slide within the created presentation.  As shown above, each panel is a separate slide that is displayed.

61.     Each slide of the presentation of www.walmart.com is automatically displayed to a user, absent human intervention, for the predetermined display duration as at least a portion of a web page.  Exhibit A confirms that (i) the slides of the presentation advance from one slide to the next based on a predetermined display duration; and (ii) the slides comprise at least a portion of the home page of www.walmart.com.

62.     Plaintiff has been damaged as a result of Walmart's infringing conduct. The Defendant is thus liable to Plaintiff for damages in an amount that adequately compensates Plaintiff for Walmart's infringement of the '629 Patent, i.e., in an amount that by law cannot be less than would constitute a reasonable royalty for the use of the patented technology, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

63.    On information and belief, to the extent marking is required, Adaptive Avenue has complied with all marking requirements. (E.g., http://www.adaptiveavenue.com; http://www.adaptiveavenue.com/uspatents/).

## V.   COUNT II
## (PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 7,428,707)

64.    Adaptive Avenue incorporates by reference the above paragraphs as if stated herein.

65.    Walmart has directly infringed the '707 Patent, including but not limited to at least claims 1 and 7 of the '707 Patent, by making, using, offer for sale, and or selling products using the infringing method for auto-composing a website using www.walmart.com (the "Accused Instrumentalities") all to the harm and detriment of Adaptive Avenue, and to the benefit of Walmart.

66.    The screenshots, images, and videos referenced here are derived from the Internet Archive of the Walmart web site on 4/18/2019 at the following location: https://web.archive.org/web/20190418113954/https://www.walmart.com/.

67.    Upon information and belief, the Accused Instrumentalities function in substantially the same manner from April 18, 2019, through the entirety of the infringement period.

68.    The Defendant makes the parts of the claimed system work in accordance with the claimed invention, including auto composing a web site.  One example is the carousel ads used on the www.walmart.com web site.  The Defendant uses or puts into use each element of the claimed system.  Further, the Amazon defendants control the claimed system, and benefit from the use of the claimed system.

69.     With respect to claim 7, the Defendant and/or other actors under the Defendant's direction or control performs methods for auto composing a web site in connection with www.walmart.com.

70.     The Defendant and/or those under its direction and/or control perform the step of composing a presentation for a desired web page by creating a list of URLs.

71.     The slides below show the code with a list of URLs to present a desired web page: first, for the "Free Store Pickup.  Last-Minute scramble?  Get egg-cited! Order Easter must-haves & pick up as soon as today." panel; second, for the "Apple Watch Series 3.  Stay active. Stay healthy.  Stay Connected.  Starting at $199." panel; and third, for the "Hurry! Ends 4/19.  Save up to 35%.  Final days to get low, low prices on everything for your backyard.  Shop all." panel:







72.     The example shown in paragraph 71 shows that the Defendant composed a presentation

for a walmart.com page by creating a list of URLs.

73.     The Defendant, and/or those under the Defendant's direction and/or control performs the step of composing a presentation for a desired web page by creating a list of URLs, wherein said step of composing comprises automatically extracting a plurality of hyperlinks from the desired web page, wherein the plurality of hyperlinks provides the URLs.

74.     The "desired web page" is www.walmart.com, which includes "web page details" (e.g., the addresses of other web pages that a Web user may want to access). The "plurality of hyperlinks" and corresponding web pages that get automatically extracted and automatically invoked in a user's Web browser are the image URLs shown in Paragraph 71.

75.     The Defendant, and/or those under the Defendant's direction and/or control, performs the step of automatically displaying the presentation, wherein the presentation is presented in order of the created list of URLs. Exhibit A shows the presentation that is automatically displayed and the order of the display of the panels corresponding to the order of the created list of URLs.

76.     Plaintiff has been damaged as a result of Walmart's infringing conduct. The Defendant is thus liable to Plaintiff for damages in an amount that adequately compensates Plaintiff for Defendant's infringement of the '707 Patent, i.e., in an amount that by law cannot be less than would constitute a reasonable royalty for the use of the patented technology, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

77.     On information and belief, to the extent marking is required, Adaptive Avenue has complied with all marking requirements. (E.g.,  http://www.adaptiveavenue.com; http://www.adaptiveavenue.com/uspatents/).

## VI.  JURY DEMAND

78.    Pursuant to Fed. R. Civ. P. 38, Adaptive Avenue Associates, Inc. hereby demands a jury trial as to all issues so triable.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against the Defendant, and that the Court grant Plaintiff the following relief:

a.    Judgment that one or more claims of United States Patent No. 7,171,629 have been infringed, either literally and/or under the doctrine of equivalents, by the Defendant;

b.    Judgment that one or more claims of United States Patent No. 7,428,707 have been infringed, either literally and/or under the doctrine of equivalents, by the Defendant;

c.    Judgment that the Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff resulting from the Defendant's infringing activities and other conduct complained of herein, and an accounting of all infringements and damages not presented at trial;

d.    That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by the Defendant's infringing activities and other conduct complained of herein; and

e.    That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

Dated: April 21, 2025

Respectfully submitted,

By: *David R. Bennett*
David R. Bennett (IL 6244214)
dbennett@directionip.com
Direction IP Law
P.O. Box 14184
Chicago, IL 60614-0184
Tel: (312) 291-1667

*Of Counsel:*
Michelle E. Dawson (*Pro Hac Vice* to be filed)
michelle@paddalawgroup.com
Devan V. Padmanabhan (*Pro Hac Vice* to be filed)
devan@paddalawgroup.com
Mariah L. Reynolds (*Pro Hac Vice* to be filed)
mariah@paddalawgroup.com
Britta Loftus (*Pro Hac Vice* to be filed)
britta@paddalawgroup.com
Paul Robbennolt (*Pro Hac Vice* to be filed)
paul@paddalawgroup.com
Sri Sankaran (*Pro Hac Vice* to be filed)
sri@paddalawgroup.com
PADMANABHAN & DAWSON, P.L.L.C.
9800 Shelard Parkway, Suite 120
Minneapolis, MN 55441
Tel: (612) 444-3601
Fax: (612) 444-31958

*Attorneys for Plaintiff*
*Adaptive Avenue Associates, Inc.*